IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2009

**STATE OF TENNESSEE v. MARLOS SHIELDS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-08713     Lee V. Coffee, Judge**

**No. W2007-01721-CCA-R3-CD   -   Filed July 15, 2009**

The defendant, Marlos Shields, was indicted on charges of aggravated robbery and aggravated burglary.  After a jury trial, the defendant was convicted of the charged offenses.  The trial court imposed a sentence of twelve years for the aggravated robbery conviction and six years for the aggravated burglary conviction and ordered the sentences to run consecutively for an effective sentence of eighteen years in the Department of Correction.  On appeal, the defendant argues that: (1) the trial court erred in denying the defendant's motion for a mistrial; (2) the evidence was insufficient to sustain his convictions; and (3) the trial court erred in imposing an excessive sentence. Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Jeff Woods, Memphis, Tennessee, for the appellant, Marlos Shields.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Carrie Shelton and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At trial, Craig Love, the victim in this case, testified that he lived with his mother, who suffered from Alzheimers and poor health.  On July 2, 2005, he was at his home interviewing a new nurse, Ms. Shirley Ann Rice, to help care for his mother.  Around 9:30 a.m., the defendant knocked on the door looking for work.  Mr. Love testified that he was acquainted with the defendant because the defendant had done some yard work for him in the past.  Mr. Love recalled that he told the

defendant that he did not have any work for him but to come back after the 4th of July holiday. In response, the defendant did not leave but insisted that Mr. Love provide him with some work. Mr. Love repeated that he did not have any work and proceeded to shut the door. Mr. Love said that as the door closed the defendant "broke in and hit me." The defendant hit Mr. Love in the stomach and back. A scuffle ensued and they both fell to the ground. The defendant then picked up a brick and hit him in the head with it. During the attack, the defendant grabbed a rifle Mr. Love kept in the kitchen corner. When Mr. Love told the defendant the rifle was empty, the defendant grabbed a pair of needle-nose pliers and jabbed Mr. Love multiple times in the back. The defendant then held the pliers against Mr. Love's neck and said, "[w]here's the money." Mr. Love told the defendant that he had some money in his pocket. Although Mr. Love could not specifically remember, he believed the defendant grabbed his wallet "out of my pocket as I turned over." Mr. Love recalled that he had his driver's license, some credit cards, two lottery tickets, a fake million dollar bill, and four to five hundred dollars in cash in his wallet the morning of the attack. Mr. Love noted that he often paid the defendant for yard work with cash from his wallet.

Mr. Love testified that the defendant left his house after the attack. Soon thereafter, the police arrived with Ms. Rice. Mr. Love told police what happened and, on July 4, 2005, he was asked to come to the police station. Mr. Love went to the police station where he gave a statement and reviewed a photographic lineup. Mr. Love identified the defendant from the photographic lineup as the man who attacked and robbed him. On cross-examination, Mr. Love acknowledged that he could not remember the details of the attack. He said, "I don't remember every exact move . . . but I remember the essence of what the heck happened." Mr. Love also acknowledged that the paramedics looked him over and told him that he "didn't need stitches in [his] head or anything." Mr. Love said that he did not go to the hospital because no one was available to take care of his mother while he was gone.

Shirley Ann Rice testified that she was hired by Mr. Love as a home-health nurse on July 2, 2005. It was her first day on the job. While Mr. Love was showing Ms. Rice around the house and explaining his mother's care requirements, someone knocked on the door. Mr. Love excused himself and went to the door. At this time, Ms. Rice was back in a bedroom with Mr. Love's mother. Ms. Rice recalled that she heard Mr. Love talking with another man. She then heard the man say, "[g]ive me my money" and Mr. Love respond, "[t]his is not a good time. You need to go and come back." Ms. Rice heard a loud noise, walked out of the bedroom, and saw a man hit Mr. Love. She then ran out of the house and sought help. The police were called and arrived at Mr. Love's residence about ten minutes after the incident.

Memphis Police Officer Lawrence Evans testified that he arrived at Mr. Love's residence within six minutes of receiving a robbery call. He took Mr. Love's statement. Mr. Love recounted that he had been attacked in his home by a Mr. Marlos, "who normally does yard work for him." Mr. Love explained the details of the attack and reported that his wallet was stolen. Officer Evans recalled that a few hundred dollars and credit cards were reported to be in Mr. Love's wallet. Officer Evans stated that, while investigating the case, he was able to ascertain the whereabouts of the defendant and relayed the information to other officers. Officer Evans recalled that the defendant

matched the general physical description Mr. Love and Ms. Rice gave on July 2, 2005. Officer Evans acknowledged that no physical evidence was recovered from Mr. Love's house.

Sergeant Dale Hensley of the Memphis Police Department testified that he called Mr. Love and asked him to come to the police station after the defendant had been placed in custody. Sergeant Hensley took pictures of some of Mr. Love's injuries, took Mr. Love's statement, and asked Mr. Love to look at a photographic lineup. Mr. Love positively identified the defendant from the photographic lineup as the man who attacked and robbed him. Thereafter, Sergeant Hensley spoke with the defendant after advising him of his *Miranda* rights. The defendant initially said that he had never met Mr. Love, did not know him, and did not work for him. However, after Sergeant Hensley confronted the defendant with Mr. Love's positive identification, the defendant said he interviewed with Mr. Love once for a job but decided not to take it because Mr. Love had an attitude.

The defendant testified on his own behalf. He testified that he knew Mr. Love because he had done yard work for him in 2005. He said he had done landscaping work for Mr. Love for about six months and worked five days a week at nine dollars per hour. However, the defendant asserted that he was not at Mr. Love's residence July 2nd, but rather, he was at the Dixie Homes projects around 9:30 that morning playing dominoes or cards with some friends. While the defendant could not recall his friends names, he claimed that he played dominoes or cards with his friends at the projects until 1:00 p.m. The defendant stated that he was arrested as a suspect July 3rd by Officer Anderson. On cross-examination, the defendant said he did not change his story about knowing Mr. Love. The defendant acknowledged that he did not give Officer Hensley the names of his friends he was with the morning of July 2nd.

Officer Chester Anderson was called by the state as a rebuttal witness. Officer Anderson testified that on July 3rd, he took the defendant into custody and transported him to the police station. At that time, Officer Anderson asked the defendant where he was the day before. The defendant responded that he was working. According to Officer Anderson, the defendant made no mention of playing dominoes or games.

Based on the foregoing evidence, the jury found the defendant guilty of aggravated robbery and aggravated burglary. The trial court sentenced the defendant to twelve years for aggravated robbery and six years for aggravated burglary. The court ordered that the defendant's sentences run consecutively for a total effective sentence of eighteen years.

## ANALYSIS

### I. Mistrial

The defendant first argues that the trial court erred in denying his motion for a mistrial when the state called Officer Anderson to rebut the defendant's testimony without previously disclosing the substance of the defendant's statement to Officer Anderson as required by the rules of discovery.

The record reflects that the defendant through counsel filed a pretrial motion for discovery. During the trial, the defendant testified that on the morning of the robbery he was playing dominoes or cards with friends at the Dixie Homes projects. The defendant recalled that he discovered the police were looking for him and he turned himself in on July 3rd. The defendant recounted that Officer Anderson was the officer who escorted him to the police station. After the defendant testified, a recess was taken. After the recess, defense counsel was apprised of the fact that Officer Anderson would be called to impeach the defendant's testimony regarding his whereabouts on July 2nd. At this time, defense counsel lodged an objection, asserting that Officer Anderson's testimony concerning the defendant's statements were not disclosed to the defense pursuant to the rules of discovery. In response, the state prosecutor submitted that: the defendant's statement was never memorialized by Officer Anderson; the defense was aware of Officer Anderson as he was listed on the arrest ticket and indictment; and the defendant referenced him when testifying. The state prosecutor also submitted that he informed defense counsel of his intent to call Officer Anderson to the stand "the minute I knew [Officer] Anderson had . . . information from this defendant . . . for impeachment purposes."

In addressing the defense's objection, the trial court found that Officer Anderson's identity was noted on the arrest ticket and indictment and known to the defendant. The court then stated the following:

> This is rebuttal proof. The State of Tennessee is not obligated under any discovery rules to provide rebuttal proof to the defense because it would be impossible to guess at or determine what rebuttal evidence might become relevant or admissible. The state has satisfied its discovery obligation in its case in chief.

> This is rebuttal proof. [The defendant] cannot claim any surprise . . . because [the defendant] knew or should have known, in fact, [the defendant] did know the identity of Officer Anderson. [The defendant] himself injected certain [facts] into the case that apparently may or may not be true, and the State of Tennessee has an absolute[] right to rebut those issues.

> And the state is not under any obligation to provide any information on rebuttal witnesses. That would be an impossible standard to hold prosecutors to, to ask prosecutors to provide any and all rebuttal information when the state has absolutely no idea what the defense case might be in most cases.

The court overruled the defense's objection and allowed Officer Anderson to testify as a rebuttal witness for the state.

The decision of whether or not to grant a mistrial rests within the sound discretion of the trial court. *State v. McKinney*, 929 S. W.2d 404, 405 (Tenn. Crim. App. 1996). The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). This

court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). On appeal, the defendant bears the burden of establishing that a "manifest necessity" for granting a mistrial existed. *Id.*

>Tennessee Rule of Criminal Procedure 16(a)(1)(A) provides:
>Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at trial[.]

This provision of Rule 16 has been interpreted to require the state to disclose the substance of any oral statement made by the defendant in response to an officer's interrogation whether admitted as part of the state's case in chief or in rebuttal. *See State v. Jenkins*, 859 S.W.2d 364, 365 (Tenn. Crim. App. 1993); *State v. Balthrop*, 752 S.W.2d 104, 107 (Tenn. Crim. App. 1988). Although it is not entirely clear from the record whether the defendant's oral statement to Officer Anderson was made in response to an interrogation, we find that the admission of the statement to be a discovery violation. Nonetheless, we note that the failure to comply with the discovery rule does not automatically warrant a mistrial.

When a party fails to comply with a discovery request, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. Tenn. R. Crim. P. 16(d)(2). The trial court has broad discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case. *State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000) (citations omitted). When determining the appropriate remedy, the trial court must consider whether a party was actually prejudice by the discovery violation and whether the prejudice cannot be otherwise eradicated. *State v. Garland*, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). The relevant inquiry is what prejudice resulted from the particular discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, had on the issue of a defendant's guilt. *State v. Ronald Mitchell*, No. 02C01-9702-CC-00070, 1997 WL 567913, at *3 (Tenn. Crim. App., at Jackson, Sept. 15, 1997), *perm. app. denied* (Tenn. April 27, 1998) (citing *State v. Cottrell*, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992). "[T]he exclusion of the evidence is a drastic remedy and should not be implemented unless there is no other reasonable alternative." *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

We see no abuse of discretion in the denial of the motion for a mistrial. The record indicates that the defendant was aware of Officer Anderson and was apprised of the state's intent to call Officer Anderson to impeach the defendant's testimony regarding his whereabouts. The defendant did not request a continuance at trial to review the substance of the oral statement and sought only the exclusion of Officer Anderson's testimony. Also, the defendant was given the opportunity to cross-examine Officer Anderson and otherwise challenge the credibility and reliability of his

testimony concerning the defendant's oral statement. In *State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984), this court held that oral statements made by a defendant, but not properly disclosed, could be admitted if they were (1) known to the defendant and (2) their introduction was not an undue burden on the defendant. The statement in this case clearly meets both criteria and the trial court properly allowed the statement to be used for impeachment of the defendant's testimony. Given the lack of prejudice in this instance, the decision to deny the motion for a mistrial was not an abuse of discretion and is affirmed.

The defendant next contends that the trial court erred in denying his motion for a mistrial based on the fact that a juror announced in open court that she knew Officer Anderson. The defendant submits that Juror Seals' comment to the court that she knew Officer Anderson "could have led the jury into affording Officer Anderson's testimony more credibility" than his testimony standing alone.

The record reflects that after a recess Officer Anderson was called to testify as the state's rebuttal witness. As Officer Anderson approached the witness stand, Juror Seals announced in open court, "I know Chester Anderson." In response, the trial court immediately excused the other jurors, including the alternate jurors, and examined Juror Seals regarding the extent of her relationship with Officer Anderson. At the conclusion of the examination, the trial court thanked Juror Seals for her service but excused her from the jury out of an "over abundance of caution." The court also denied the defendant's request for a mistrial, finding no sufficient reason or manifest necessity to declare a mistrial. The remaining jurors were then allowed to return to the courtroom, and the court instructed them as follows:

> Ladies and gentlemen, right before we took a recess the Court was getting ready to swear in Officer Chester Anderson, and one of your members, Ms. Carolyn Seals, got the Court's attention and indicated that she might have known Officer Chester Anderson.

> And I've conducted an inquiry outside of your presence, and you see that Ms. Seals is no longer one of your members . . . . Ms. Seals hasn't done anything wrong, I want to emphasize, but she did exactly what the Court told all of [you] before the trial – that if you knew any witnesses or thought you might know anybody, to bring it to the Court's attention.

> [Ms.] Seals indicated that she recognized Chester Anderson, Officer Anderson . . . and because of the fact that Ms. Seals has known Officer Anderson, the Court has excused Ms. Seals from serving further on this jury because it wouldn't be fair to anybody – Ms. Seals, Officer Anderson, the State of Tennessee, or [the defendant] to have a juror who might know a witness [and] to make a decision as to whether or not that witness is credible or not credible.

And so the Court has excused Ms. Seals, and I'm going to order whatever you heard from Ms. Seals before we took a recess that you disregard that. You cannot consider that for any purpose at all. Again, Ms. Seals has not done anything wrong. . . . [You must] base your verdict on the testimony that you heard in the courtroom.

. . . you [must] determine Officer Anderson's credibility based on what you hear in court and what you see during the course of his testimony. Does everyone understand that?

The record reflects that all the jurors indicated they would follow the instructions of the court.

To reiterate, this court will not disturb the trial court's decision to grant or deny a mistrial unless there is an abuse of discretion. *Williams*, 929 S.W.2d at 388. Contrary to the defendant's allegation, there exists no evidence in the record showing the defendant was prejudiced by Juror Seals' comment that she knew Officer Anderson. Moreover, the record clearly indicates that the trial court implemented proper measures to cure any possible prejudice to the defendant. The court discretely dismissed Juror Seals and instructed the jury to ignore Juror Seals' comment and evaluate Officer Anderson's credibility based on his testimony and nothing else. The jury affirmed that they would follow the court's instructions. Accordingly, we conclude that the trial court did not abuse its discretion in failing to grant a mistrial, and we deny the defendant relief on this issue.

## II. Sufficiency of Evidence

The defendant next challenges the sufficiency of the convicting evidence based on the "numerous inconsistencies in Craig Love's testimony and Shirley Rice's testimony."

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from

the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The defendant was convicted of aggravated robbery and aggravated burglary. Aggravated robbery is defined in pertinent part as "robbery as defined in § 39-13-401 . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the other person in fear." *Id*. § 39-13-401. Aggravated burglary is defined in relevant part as entering a habitation without the effective consent of the owner and with the intent to commit a felony, theft, or assault. *Id*. § 39-14-402(a)(1), -403(a). A habitation is defined, as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" *Id*. § 39-14-401(1)(A).

Viewed in the light most favorable to the state, the evidence presented at trial established that the defendant forced his way into Mr. Love's residence, assaulted him with a large brick and a pair of needle-nose pliers, and demanded money. During the assault, the defendant stole Mr. Love's wallet containing several hundred dollars and credit cards. Mr. Love reported the incident to the police and positively identified the defendant as the individual who attacked him. Although Ms. Rice did not see the individual who attacked Mr. Love, she corroborated the fact that Mr. Love was attacked. The defendant's sufficiency argument centers around a challenge to the credibility of the state witnesses. The weight and credibility of the state witnesses' testimony and the reconciliation of conflicts in their testimony, if any, are matters entrusted exclusively to the jury as the trier of fact. Here, the jury by its verdict accredited the testimony of the state witnesses. Because the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt, we affirm the defendant's convictions. The defendant is without relief as to this issue.

### III. Sentencing

### *A. Length of Sentence*

The defendant next contends that the trial court erred in imposing an excessive sentence of eighteen years imprisonment.

Since a sentencing issue has been raised on appeal, we conduct a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then a review of the challenged sentence is de novo without the presumption of correctness. *State v. Ashby*, 823 S. W.2d 166, 169 (Tenn. 1991). In conducting a de novo review of a sentence, we must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the

accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentencing decision was improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if: (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210.

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989 and its amendments. The trial court is free to select any sentence within the applicable range so long as the length of the sentence complies with the purposes and principles of the Sentencing Act. *Id.* § 40-35-210; *see also State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (noting that such principles encompass themes of punishment fitting of the crime, deterrence, and rehabilitation). However, the trial court is required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id*. § 40-35-114.

The defendant was convicted of aggravated robbery, a Class B felony, and aggravated burglary, a Class C felony. *See id.* §§ 39-13-402(b); 39-14-403(b). He was classified as a Range I offender. Therefore, his sentencing range was eight to twelve years for his B felony, and three to six years for his C felony. *Id*. § 40-35-112(a). The defendant received the maximum sentences in the range as the trial court sentenced the defendant to twelve years for aggravated robbery and six years for aggravated burglary.

In challenging the length of his sentences, the defendant first contends that the trial court improperly gave weight to the victim's desire that the court "impose the maximum sentence for both offenses." However, the record does not support this contention. The portion of the record cited by the defendant reveals nothing more than the court's brief summation of the contents of the victim's letter, and its admission into evidence. Moreover, we note that a court should consider relevant and reliable evidence from the victim as part of its sentencing determination. *See generally State v. Ring*, 56 S.W.3d 577 (Tenn. Crim. App. 2001); *see also* Tenn. Code Ann. § 40-35-210(b)(5). Accordingly, the defendant's contention is misplaced and without merit.

The defendant next takes issue with the trial court's application of enhancement factor (14), that the defendant abused a position of private trust. As to enhancement factors, the trial court found that the defendant had a previous history of criminal convictions evidenced by the presentence report, that the defendant abused a position of private trust that significantly facilitated the commission of the offenses, and the defendant employed a deadly weapon in the commission of aggravated burglary. *See* Tenn. Code Ann. § 40-35-114(1), (14), (9). The court found no mitigating

factors. Regarding factor (14), the trial court found that the defendant abused a position of private trust because the victim would "not have answered the door without a gun, had he not known the person that was at his door, asking to enter into his house." The court then found that the defendant's actions terrorized the entire household and without "being in a position to enter that house" the defendant would not have been in a position to terrorize the household.

It is well-settled that proper application of the private trust factor requires that the court examine "the nature of the relationship," and whether that relationship "promoted confidence, reliability, or faith." *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). "A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." *Id*. It is the exploitation of this vulnerability to achieve the criminal offense which is deemed more blameworthy and thus justifies application of the enhancement factor. *Id*.

The record in this case does not provide a sufficient factual basis for applying enhancement factor (14), abuse of private trust. To begin, nothing in the record suggests that the victim answered the door to his residence differently for strangers (with a gun) than he did for people he knew (without a gun). In fact, the record indicates that the defendant was not allowed inside the residence and was told to leave prior to forcing his way into the residence. The record also establishes that the relationship between the victim and the defendant was casual and tentative in that the victim knew the defendant because he had done some yard work for him a couple of times in the past. Therefore, it is our view that the evidence in the record neither demonstrates a relationship which promoted confidence, reliability, or faith, nor the abuse of such a relationship by the defendant in order to substantially facilitate the offenses of aggravated robbery and aggravated burglary. Accordingly, we conclude that the trial court erred in finding that the defendant abused a position of private trust.

However, an error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and that the imposed sentence is not inconsistent with the purposes of the Sentencing Act. *See* Tenn. Code Ann. § 40-35-210(b). Despite the trial court's reliance on an inapplicable enhancement factor, the record supports the court's consideration of factor (1), the defendant's criminal history; and factor (9), that the defendant employed a deadly weapon in the commission of aggravated burglary. The record shows the defendant had prior convictions for simple assault, disturbing the peace, a weapons offense, escape from a workhouse through violence, and breaking and entering. The record also reveals that the defendant employed a large brick and needle-nose pliers to assault the victim. The record reflects that in determining the specific sentence length, the trial court considered the provisions of Tennessee Code Annotated section 40-35-210, as well as the required principles of sentencing. As such, we affirm the sentences as imposed.

### B. Consecutive Sentencing

Next, the defendant challenges the court's imposition of consecutive sentencing. Specifically, he argues that the trial court erred by ordering him to serve his sentences consecutively

on the basis that the defendant was a dangerous offender without evidence that an "extended sentence is necessary to protect the public against further criminal conduct" by the defendant.

When a defendant is convicted of more than one criminal offense, the trial court may order that the sentences run concurrently or consecutively as guided by Tennessee Code Annotated section 40-35-115. Pursuant to this code section, a trial court may order consecutive sentencing if any of the following criteria are found by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

> (2) The defendant is an offender whose record of criminal activity is extensive;

> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to victim or victims;

> (6) The defendant is sentenced for an offense committed while on probation; or

> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). However, if the trial court imposes consecutive sentencing based upon a finding that the defendant is a dangerous offender, the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). Additionally, the trial court should consider general sentencing principles, including whether the length of a sentence is justly deserved in relation to the seriousness of the offense. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The decision to impose consecutive sentencing falls within the sound discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

In ordering consecutive sentences, the trial court stated the following in relevant part:

-11-

[T]he Court finds, for the record, that [the defendant] is a dangerous offender whose behavior indicates little or no regard for human life. And, the court finds that [the defendant] had no hesitation about committing a crime in which the risk to human life is high.

. . . .

This defendant attacks [Mr. Love] who had graciously given [the defendant] employment, had allowed [the defendant] to work . . . some five months . . . . And, the defendant invaded Mr. Love's house in the presence of his very ill mother, in the presence of new help . . . . And, [the defendant] invaded that house, struck [Mr. Love] with a brick, and stabbed Mr. Love some twenty times, and threatened to kill Mr. Love in Mr. Love's own house. A crime that is absolutely shocking to the conscience of everybody in Memphis, Shelby County, Tennessee.

A home invasion is one of the most . . . frightening crimes that can happen to anyone. If you cannot be safe in the sanctity of your home, the question becomes, where in the world can you be safe in this community. And, when you're at home, trying to take care of your mother, who is very ill, bedridden, and you're attacked and brutalized and stabbed and bashed in the head. [sic] Mr. Love testified that he couldn't even go to the hospital because he didn't have anybody to care for his mother . . . .

And, the Court finds that the circumstances of the offenses are extremely aggravated. The Court further finds that confinement for an extended period of time is necessary to protect this community, to protect society from the defendant's unwillingness to lead a productive life, and that the defendant has a history of resorting to criminal acts in order to facilitate or to sustain his existence.

This Court finds that this defendant has a long history of committing offenses not only against this state, but against the state of Michigan. This Court finds the defendant has committed offenses while incarcerated, not only in this state, but also in other states.

. . . .

And, this Court further finds that the aggregate length of the sentence reasonably relates to the offenses committed by the defendant, and for which the defendant stands convicted.

While we were unable to corroborate all of the court's findings in this case, we perceive no error in the court's finding that the defendant was eligible for consecutive sentencing because he was

-12-

a dangerous offender. It is our view that the court sufficiently articulated its reasons for finding that the defendant was a dangerous offender, including why the sentences imposed reasonably related to the seriousness of the offenses and were necessary to protect the public from further criminal activity by the defendant. The record reflects that the defendant forced himself into the victim's home, demanded money, and then violently assaulted the victim with two deadly weapons, a brick and pliers. In sum, the court's findings appear to be supported by the record and meet the threshold burden for imposing consecutive sentencing. Accordingly, the defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing review, the judgments of the trial court are affirmed.

_____
J.C. McLIN, JUDGE